UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

John D. Haywood,

      Plaintiff,

      v.                               Civil Action No. 2:12-CV-164

St. Michael's College, Logan R. Spillane,
Christopher Hardy,

      Defendants.

## OPINION AND ORDER
(Docs. 7, 12, 15, 16, 23, 26, 27)

Plaintiff John D. Haywood, a candidate for President of the United States in the

2012 New Hampshire Democratic primary, commenced this libel action against

Defendant St. Michael's College and two of its students, Defendants Logan R. Spillane

and Christopher Hardy (the "student Defendants").  On October 10, 2012, Plaintiff filed

an Amended Complaint, alleging that, approximately one week before the January 2012

primary, Defendants published on the internet a "Profile" of Plaintiff's candidacy that

contained false statements about Plaintiff's policy positions, resulting in Plaintiff's loss in

the election and injury to his reputation in his home community of North Carolina.  (Doc.

19 at 5.)

Presently before the Court are Defendants' renewed motions to dismiss the

Amended Complaint for failure to state a claim upon which relief may be granted

pursuant to Fed. R. Civ. P. 12(b)(6) (Docs. 23, 26), and Defendants' renewed special

motions to strike the Amended Complaint pursuant to Vermont's anti-SLAPP statute, 12

V.S.A. § 1041 (Docs. 26, 27).[1]  Plaintiff filed a response (Doc. 29), to which Defendant

St. Michael's College filed a reply (Doc. 30), and a hearing on the motions was held on

November 28, 2012.

For the reasons explained below, the Court GRANTS Defendants' motions, and

awards costs and reasonable attorney's fees to Defendants.

### Factual and Procedural Background

In deciding Defendants' motions, the Court accepts as true the factual assertions

stated in Plaintiff's Amended Complaint, as summarized below.  *See Desiano v. Warner-*

*Lambert Co.*, 326 F.3d 339, 350 (2d Cir. 2003).

Plaintiff John D. Haywood, a resident of North Carolina, ran for President of the

United States in the 2012 Democratic primary in the state of New Hampshire.  As part of

his campaign, he created and maintained a website and ran advertising in New Hampshire

newspapers.  (Doc. 19 at 5.)  The student Defendants referred to Plaintiff's website in

completing a journalism assignment for an undergraduate course at St. Michael's

College, which required them to write a "Profile" on Plaintiff's run for the presidency

(hereafter referred to as "the Profile").  (Doc. 8 at 1; Doc. 12 at 2; Doc. 19-3 at 1.)  The

student Defendants also interviewed Plaintiff by telephone and spoke with several of his

associates from North Carolina in completing the assignment.  (*Id.*)  On January 4, 2012,

---

[1]  Prior to the filing of the Amended Complaint, Defendants filed motions to dismiss and special motions to strike with respect to Plaintiff's original Complaint.  (*See* Docs. 7, 12, 15, 16.)  Because the Amended Complaint supersedes the original Complaint, these original motions are denied as moot.  *See Fredericks v. City of New York*, No. 12 Civ. 3734, 2012 WL 3667448, at *1 (S.D.N.Y. Aug. 27, 2012).

the student Defendants' professor posted the Profile on the College's website. (Doc. 8 at 1; Doc. 19 at 5; Doc. 19-3).[2]

Plaintiff alleges that the Profile grossly mischaracterized his policy positions. In his Amended Complaint, he identifies fifteen allegedly false statements contained in the Profile. In summary form, they are:

(1) The Profile stated that Plaintiff planned to raise the estate tax, when in fact he advocated raising the *income* tax. According to the Amended Complaint, Plaintiff's actual proposed reforms to the estate tax—which seem to call for a reduction of the tax rate paid by relatively small estates—would have actually reduced revenues raised from the estate tax.[3] (Doc. 19 at 6; Doc. 19-1 at 11-12; Doc. 19-3 at 1.)

(2) The Profile stated that "Haywood is in favor of using these taxes to fund social programs that he believes will revitalize the country." (Doc. 19-3 at 1.) The Amended Complaint asserts that Plaintiff was not in favor of any increase in the estate tax, and proposed spending from the revenue increase of his income tax proposal for infrastructure renewal and government contracts. (Doc. 19 at 6-7; Doc. 19-1 at 9.)

---

[2] The Profile is still available online. *See* Chris Hardy & Logan Spillane, *John D Haywood: Eclectic Democrat with Detailed Plans*, http://journalism.smcvt.edu/webcourses/PresidentialProfiles/JohnHaywood.htm (last visited Dec. 14, 2012).

[3] This misrepresentation was particularly egregious, by Plaintiff's description, because the very same section of the Profile concluded by citing an economics professor who described the unlikelihood of an increase in the estate tax making "any difference that the American people can feel." (Doc. 19-3 at 1.) According to Plaintiff, these misstatements, as fodder for the professor's subsequent criticisms, were made to "set up Plaintiff for ridicule." (*Id.* at 7.)

(3)     The Profile stated that Plaintiff "feels pro-life supporters 'punish the pregnant woman' due to the fact that they oppose abortion."  (Doc. 19-3 at 1.)  But on his website, Plaintiff indicated that pro-life individuals aim to "punish the pregnant woman for having sex in the first place, with additional condemnation for those who had sex with the intention or expectation of not getting pregnant."  (Doc. 19-1 at 14.)  Plaintiff asserts that the Profile made it appear as though he considered pro-life individuals to be motivated by "pettiness or spite," resulting in Plaintiff being "held . . . up for ridicule and scorn not only by the millions of people who saw the Profile, but by members of his own church where Plaintiff has served as vestryman."  (Doc. 19 at 7.)

(4)     The Profile stated that a cartoon on Plaintiff's website "comments on Europe's systems of state run healthcare."  (Doc. 19-3 at 1.)  According to Plaintiff, the cartoon instead commented on the United Kingdom's health care system, and not Europe's systems.  (Doc. 19 at 7.)  Further, Plaintiff claims that the Profile's description of the cartoon "conveys to its readers that the Plaintiff hasn't decided what path he wants the United States to follow on health care."  (*Id*.)

(5)     The Profile stated that Plaintiff proposed "switching to a single-payer system that is similar to the one in Britain."  (Doc. 19-3 at 1.)  Plaintiff instead proposed switching to a system "*identical* to Britain's National Health Service."  (Doc. 19-1 at 1.)

(6)     The Profile stated that Plaintiff "believes that the best and most efficient health care systems are domestic." (Doc. 19-3 at 1.) By Plaintiff's description, this statement reads as praising the efficiency of the American health care system, contrary to his policy position that advocated a switch from the American for-profit health care industry to a nationalized system. (Doc. 19 at 8.)

(7)     The Profile stated: "Haywood also claims that if his health care proposal were put into place, the country would save over a trillion dollars per year as compared to the ten year projection of the current health care bill. This claim was unable to be substantiated due to the fact that Haywood leaves out key elements of specifics in his health care pitch." (Doc. 19-3 at 1.) In his Amended Complaint, Plaintiff engages in various calculations—namely, finding the difference between American and British per person health care costs and multiplying that number by America's population—to show the savings he described in his campaign materials. (Doc. 19 at 9.) He alleges that the uncertainty described in the Profile portrays him as "a bumbler and holds him up to ridicule and disgrace." (*Id.*)

(8)     The Profile described Plaintiff's proposed tax plan as "steep, yet progressive," stating that Plaintiff advocated a return to the tax code of 1965. (Doc. 19-3 at 1.) Plaintiff does not deny the truth of these statements, but instead argues that it was defamatory for the Profile to neglect to mention the savings attributed to his health care proposal in the same section. (Doc. 19 at 9-10.) By Plaintiff's description, health premiums constitute a "private tax" that he would lower by introduction of a National Health Service, but a portion of that savings

would be given to the government in the form of higher income taxes. According to Plaintiff's campaign literature, "[l]ike love and marriage, the tax increase and the tax cut go together." (Doc. 19-2 at 7.) By mentioning the higher income taxes without the tax decrease from lower premiums, the students "h[e]ld Plaintiff up for ridicule." (Doc. 19 at 10.)

(9)     The Profile stated that Plaintiff is "vehemently opposed to Israel." (Doc. 19-3 at 1.) Instead, according to his Amended Complaint, Plaintiff has expressed "vehement opposition" to Israel's treatment of the Palestinian people. (Doc. 19 at 10.) Plaintiff concedes that this assertion alone is not defamatory, "but when read with the other charges leveled against him in the same Foreign Policy section, it is clear that he is being accused of being prejudiced and bigoted and is being made an object of scorn, ridicule, and disgrace." (*Id.*)

(10)    The Profile stated that Plaintiff is "vehemently opposed to . . . what he calls the 'Jewish Lobby.'" (Doc. 19-3 at 1.) Plaintiff asserts that such a statement is libelous "per se" because it is "inherently injurious to reputation." (Doc. 19 at 10.) According to Plaintiff, this misstatement is "an attempt to smear Plaintiff as a prejudiced, racist, and bigoted person."[4] (*Id.* at 11.)

(11)    The Profile stated: "During an interview[,] Haywood explained that he believed . . . Israel is forcing our involvement in the Middle East." (Doc. 19-3 at 1.) Plaintiff denies ever having made such a statement, and again maintains that

---

[4] Throughout his campaign website, however, Plaintiff repeatedly refers to the "Israel Lobby," including many citations to a book bearing that title. (Doc. 19-1 at 1, 21, 24.) The website also describes Zionism as "an evil force." (*Id.* at 26.)

this section of the Profile was "designed to portray Plaintiff as a bigoted, prejudiced individual." (Doc. 19 at 11.)

(12)     The Profile stated that Plaintiff believed that "Israel was a primary factor in the American economic downturn and blamed the 'Jewish Lobby' for distracting us from our domestic problems." (Doc. 19-3 at 1.) Plaintiff asserts that this statement is libelous because he instead blamed the structure of the American income tax system for the country's economic problems. (Doc. 19-1 at 8-10.)

(13)     The Profile stated: "[Plaintiff] also accused key Republican members of Congress of taking bribes from this 'Jewish Lobby' in return for favorable treatment." (Doc. 19-3 at 1.) Plaintiff denies ever having made such a statement, and again argues that the statement reflects an effort to portray him as an anti-Semite.[5] (Doc. 19 at 12.)

(14)     The Profile stated that, to curb global warming, Plaintiff "proposes more lab and in-field research as a way to gain more knowledge about the issue. He also offers a solution to global warming which is to spray particles into the

---

[5] Regarding the American-Israeli relationship, Plaintiff's website does state that the relationship "is due largely to the political influence of a loose coalition of individuals and organizations that actively works to steer U.S. foreign policy in a pro-Israel direction." (Doc. 19-1 at 24.) In his print advertising, Plaintiff describes "how the support for Zionism has grown out of United States domestic politics, the pressure on American political leaders, the endless and ever growing American financial and military aid to Israel, and our blind eye to development of Israeli weapons of mass destruction." (Doc. 19-2 at 6.) By way of example, the website states that, when President Eisenhower threatened to reduce aid to Israel, "the Israel lobby went to work on Congress . . . and all hell broke loose." (Doc. 19-1 at 24.) Later, when President Ford and Secretary of State Kissinger issued the same threat, the possibility of a revocation of aid "was derailed when 76 senators signed a letter sponsored by the American Israel Public Affairs Committee demanding Ford remain 'responsive' to Israels' [sic] economic and military needs." (*Id*. at 25.) The website also indicates that President Truman described "[t]he persistence of a few of the extreme Zionist leaders—actuated by political motives and engaging in political threats." (*Id*. at 23.) Finally, Plaintiff's website states that "Zionists had tried to bribe India with millions and . . . [the Prime Minister's sister] received daily warnings that her life was in danger unless 'she voted right.'" (*Id*.)

atmosphere as a way to reflect the sun's heat back into space, which, in his opinion, would cool the earth." (Doc. 19-3 at 2.) Plaintiff denies that he ever proposed lab and in-field research into the issue of whether greenhouse gases are causing global warming. (Doc. 19 at 12.) Instead, he proposed such research to find "ways to geoengineer the cooling of the earth." (Doc. 19 at 12.) Further, Plaintiff asserts that he has never claimed to have the solution to global warming, but instead identified particle insertion as "one of the most promising areas for research" into how to cool the planet. (*Id.*) Plaintiff alleges that the Profile's misrepresentations "portray [him] as a reckless, arrogant, unreasonable, and dangerous individual deserving of ridicule and condemnation." (*Id.* at 13.)

(15) The Profile stated that Plaintiff "believes that children need to learn to read and write at [a] young age, but are not afforded the opportunity to do so." (Doc. 19-3 at 2.) In fact, the problem Plaintiff aims to address arises "years before a child is old enough to read." (Doc. 19 at 13.) Further, Plaintiff knows "that a child will learn to read when he or she is good and ready to do so—and not before." (*Id.*) Plaintiff asserts that the Profile's statements to the contrary "hold[] him up to ridicule and disgrace."[6]

---

[6] On his website, Plaintiff writes:

In modern day America an awful lot of schoolchildren can't read or can barely read and they perform at a much lower level than their fellows. And, obviously, if they can't read worth a fig they can't write worth a fig nor can they learn worth a fig. In many cases—at the preschool ages when a child should be greatly increasing his or her vocabulary and learning language skills at home—no one is speaking to that child or speaking very little. No one is reading to that child, or reading very little. And because of this these children have "bounds" placed on their minds at an enormously important time in their lives. By the time they're school age, they're handicapped for life. (Doc. 19-1 at 19.)

On January 10, 2012, President Barack Obama won the Democratic primary in New Hampshire.[7] After a failed effort to resuscitate his campaign by publishing an advertisement in the Los Angeles Times newspaper (Doc. 19-2 at 11), Plaintiff terminated his campaign in late March 2012 (Doc. 19 at 5).

Plaintiff filed his original Complaint in this action on July 24, 2012 (Doc. 1), and his Amended Complaint, largely unchanged from the original, on October 10, 2012 (Doc. 19). Therein, he claims that the various discrepancies between his stated policy positions and those outlined in the Profile constitute libel. Further, he contends that the student Defendants' efforts to contact his associates in North Carolina are evidence of malice because Plaintiff was trying to keep his candidacy a secret from people in his home state. (Doc. 19 at 3.) Plaintiff claims that he was harmed both because the Profile reduced his chances of victory in the primary and because, in preparing the Profile, the student Defendants informed Plaintiff's friends in North Carolina, many of whom are Republicans, that Plaintiff was running in the Democratic primary in New Hampshire. (*Id*. at 3-4.) Plaintiff seeks full reimbursement of all his advertising costs ($120,202.15),

---

[7] Plaintiff alleges in his Complaint that he received 432 votes, losing to the incumbent by a ratio of 115 to 1. (Doc. 19 at 4.) According to information from the New Hampshire Secretary of State's website, the President received 49,080 votes to Plaintiff's 423. All told, including write-in candidates Plaintiff came in ninth place in the primary, behind (in this order) Obama, Ron Paul, Mitt Romney, Jon Huntsman, Ed Cowan, Vermin Supreme, "Scatter" (a designation given to write-in votes for Hillary Rodham Clinton), and Randall Terry. *See* Fed. R. Evid. 201 ("A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."); *Alvary v. United States*, 302 F.2d 790, 794 (2d Cir. 1962) ("On fact questions the court should not use the doctrine of judicial notice to go outside the record unless the facts are matters of common knowledge or are capable of certain verification.").

damages as a result of the reputational injury he allegedly suffered in his local community ($1,000,000), and punitive damages ($50,000,000).[8]

**Discussion**

**I.    Motions to Dismiss for Failure to State a Claim**

In their motions to dismiss for failure to state a claim, Defendants assert that Plaintiff has failed to allege an actionable claim for libel.  (Docs. 22, 26.)  As set out in greater detail below, Plaintiff fails to state a libel claim for three reasons: (1) his claim does not satisfy the elements of libel *per se* or *per quod* under North Carolina law; (2) his claim does not establish the state of mind or injury elements of a libel claim under New Hampshire law; and (3) his claim falls short of establishing that the Profile was written and published with "actual malice" as required, given Plaintiff's status as a public figure, by *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964).

**A.    Legal Standard**

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)); *see also* Fed. R. Civ. P. 8(a)(2) (pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief").  "A claim has facial plausibility when the plaintiff pleads factual content that

---

[8]  According to Plaintiff, this sum of punitive damages "represents a scant 13 days['] worth of savings to the American people when British health care is substituted for existing American care. . . . It is also an amount that will, after tax, enable Plaintiff to run in 2016 with a cleared name and . . . the ability to do the advertising that can perhaps overcome his low 2012 vote count."  (Doc. 19 at 14.)

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  As detailed in *Iqbal* and *Twombly*, this does not require a plaintiff to provide "detailed factual allegations" to support his claims, *Twombly*, 550 U.S. at 555, but the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id*.  In reviewing the pleadings, the court must accept factual assertions as true, but this presumption of truth "is inapplicable to legal conclusions" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678; *see also Faber v. Metropolitan Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) ("We are not . . . bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions" (citation omitted)).

In general, in cases like this involving a *pro se* plaintiff, the court must construe the complaint "liberally," *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), by "reading such submissions 'to raise the strongest arguments they suggest.'" *Berlin v. United States*, 478 F.3d 489, 491 (2d Cir. 2007) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).  "This policy of liberally construing *pro se* submissions is driven by the understanding that '[i]mplicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training.'" *Triestman v. Federal Bureau of Prisons*, 470 F.3d 471, 475 (2d Cir. 2006) (quoting

*Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)).[9]  Even *pro se* litigants, however,

"remain subject to the general standard applicable to all civil complaints under the

Supreme Court's decisions in *Twombly* and *Iqbal*."  *Brickhouse v. City of New York*, No.

09 CIV. 9353, 2010 WL 3341845, at *2 (S.D.N.Y. Aug. 16, 2010); *see Bisson v. Martin*

*Luther King Jr. Health Clinic*, No. 07-5416-CV, 2008 WL 4951045, at *1 (2d Cir. Nov.

20, 2008).[10]

## B.     Choice of Law

Although Plaintiff was a candidate in the New Hampshire presidential primary, he

is a resident of North Carolina.  He is suing a College located in Vermont and two

students who attend that College.  Before ascertaining whether Plaintiff has stated a valid

claim for defamation, the Court must decide whether the law of North Carolina, New

Hampshire, or Vermont applies.  In answering this question, the Court must apply the law

of the forum state, i.e., Vermont law.  *See Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d

386, 393 (2d Cir. 2001) ("A federal trial court sitting in diversity jurisdiction must apply

---

[9]  But here, the *pro se* Plaintiff was himself a lawyer by profession.  (Doc. 19-1 at 6.)  Where a *pro se* litigant himself has considerable litigation experience—and is thus familiar with legal terminology, the litigation process, and pleading requirements—the need for a liberal reading of the complaint is reduced.  *See Cusamano v. Sobek*, 604 F. Supp. 2d 416, 445-46 (N.D.N.Y. 2009); *In re Fengling Liu*, 664 F.3d 367, 370-71 (2d Cir. 2011) (if a lawyer assists in the drafting of a pleading "there will be no reason to apply liberal construction"); *Johnson v. Eggersdorf*, 8 F. App'x 140, 143 (2d Cir. 2001) (limiting deference to *pro se* inmate where he had previously filed numerous lawsuits, and was thus "quite familiar with the legal system").  Plaintiff, however, is not presently admitted to the bar in any state and has not practiced law, by his own description, since 1984.  As a result, this Court will read his Complaint with the special solicitude generally reserved for inexperienced *pro se* litigants.

[10]  Also, in reviewing a motion to dismiss "a court is not limited to the four corners of the complaint; a court may also consider 'documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, or . . . documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.'"  *Burton v. Lynch*, 664 F. Supp. 2d 349, 357 (S.D.N.Y. 2009) (quoting *Brass v. American Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)).

the law of the forum state to determine the choice-of-law."); *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941).

For tort claims, Vermont follows the Restatement (Second) of Conflicts of Laws to determine the applicable substantive law. *Amiot v. Ames*, 166 Vt. 288, 292 (1997). "[T]he Second Restatement consists of a series of narrowly worded sections establishing choice-of-law preferences for specified torts or particular issues counterbalanced by open-ended criteria that act as an escape valve in situations when applying the specific, presumptive sections would make little sense." *Martineau v. Guertin*, 170 Vt. 415, 417 (2000). As such, the first step in the analysis "is to ascertain whether a specific section of the Restatement governs what law should ordinarily apply to the particular action or legal issue." *Id.* If so, that section applies; if not, the general principles of the Restatement control, and the court applies the law of the state that "has the most significant relationship to the occurrence and the parties." Restatement (Second) of Conflict of Laws § 145(1) (1971).

The Restatement (Second) contains a specific section addressing defamation, which provides:

> (1) The rights and liabilities that arise from defamatory matter in any . . . broadcast over radio or television . . . or similar aggregate communication are determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

> (2) When a natural person claims that he has been defamed by an aggregate communication, the state of most significant relationship will usually be the state where the person was domiciled at the time, if the matter complained of was published in that state.

Restatement (Second) of Conflict of Laws § 150(2) (1971). Courts have held that publication to a website, as occurred with the Profile, constitutes "aggregate communication," i.e., communication to the general public occurring simultaneously in multiple jurisdictions. *See, e.g., Oja v. U.S. Army Corps of Eng'rs*, 440 F.3d 1122, 1131 (9th Cir. 2006) (internet publication is form of "aggregate communication" intended for broad public audience similar to print media); *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 100 (2d Cir. 2003) ("When people post information onto a website available to the public, they 'distribute' or 'give away' the information."). Applying the Restatement (Second) here, the Court finds that the state with the most significant relationship to the allegedly defamatory publication is the place of Plaintiff's domicile, North Carolina. *See Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 471 (E.D. Pa. 2010) ("[T]he majority of courts confronted with this choice of law question have found that the plaintiff's domicile should control since this is the forum with the greater interest."). Because Plaintiff was domiciled in North Carolina at the time (Doc. 19 at 2), the Restatement seemingly calls for the application of North Carolina law.

In certain cases, however, the Restatement also recognizes that special damages from such defamatory publications, due to their aggregate nature, may occur in more than one jurisdiction. In such cases, "[i]t is possible that . . . the local law of each of these states will be applied to determine the plaintiff's right to recover for the special damage he is alleged to have suffered within its territory." Restatement (Second) of Conflict of Laws § 150 cmt. d. In other words, Plaintiff's right to recover for the loss of the election

may be determined in accordance with New Hampshire law, while his reputational injury could be assessed under North Carolina law.

Fortunately, this Court need not resolve the conflict of law question because the law of these jurisdictions is not actually in "conflict" at all—Plaintiff's claim must be dismissed under either North Carolina or New Hampshire law.

## C.    North Carolina Defamation/Libel Law

The term "defamation" encompasses two distinct torts: libel and slander.  In general, "libel is written while slander is oral."  *Phillips v. Winston-Salem/Forsyth Cnty. Bd. of Educ.*, 450 S.E.2d 753, 756 (N.C. Ct. App. 1994).  Because Plaintiff's claims relate solely to a written publication (i.e., the Profile), the law governing libel applies.  North Carolina recognizes three classes of libel: "(1) publications obviously defamatory which are called libel *per se*; (2) publications susceptible of two interpretations one of which is defamatory and the other not; and (3) publications not obviously defamatory but when considered with innuendo, colloquium, and explanatory circumstances become libelous, which are termed libels *per quod*."  *Renwick v. News & Observer Pub. Co.*, 312 S.E.2d 405, 408 (N.C. 1984).[11]  The Court addresses the applicability of each in turn.

### 1.    Libel *Per Se*

Libel *per se* "is a publication by writing, printing, signs or pictures which, when considered alone without innuendo, colloquium or explanatory circumstances: (1)

---

[11]  In recognition of the requirement to construe the Complaint in Plaintiff's favor, the Court assumes—solely for the sake of argument and not as a definitive holding of this order—the falsity of the statements contained in the Profile, including the description of Plaintiff's estate tax plan and position on Israel.  Because Plaintiff's claims fail on numerous other grounds, the Court need not delve into the actual veracity of these and other statements made in the Profile.

charges that a person has committed an infamous crime; (2) charges a person with having an infectious disease; (3) tends to impeach a person in that person's trade or profession; or (4) otherwise tends to subject one to ridicule, contempt or disgrace." *Id*. at 409. Crucially, under North Carolina law, a statement is libel *per se* only if it is "susceptible of but one meaning," and this one meaning unambiguously "tend[s] to disgrace and degrade the party or hold[s] him up to public hatred, contempt or ridicule." *Id*. In making this determination, the publication must be stripped of its context and assessed solely by "how . . . ordinary men [would] naturally understand the publication. . . . The fact that supersensitive persons with morbid imaginations may be able, by reading between the lines of an article, to discover some defamatory meaning therein is not sufficient to make them libelous." *Id*. (quotation omitted). In an action for libel *per se*, "malice and damages are deemed presumed by proof of publication, with no further evidence required as to any resulting injury." *Boyce & Isley, PLLC v. Cooper*, 568 S.E.2d 893, 898 (N.C. Ct. App. 2002).

By this standard, the Profile is not libelous *per se*. Clearly, the Profile did not charge Plaintiff with the commission of a crime, did not allege that he had an infectious disease, and did not impeach Plaintiff's profession. The only remaining basis for liability is that Plaintiff was subjected to "ridicule, contempt or disgrace" because of the Profile. *Renwick*, 312 S.E.2d at 409. Even accepting Plaintiff's allegations of falsehood, however, the alleged libelous statements consist merely of incorrect descriptions of Plaintiff's policy positions. In contrast to the publication at issue in *Boyce & Isley,*

*PLLC*, 568 S.E.2d at 893,[12] a North Carolina case recognizing actionable libel for a political advertisement, nothing in the Profile impugns Plaintiff at a personal level. Instead, the positions described in the Profile, even if different from those actually held by Plaintiff, are not so outlandish that they "expose [Plaintiff] to public hatred, contempt, or ridicule" and rise to the level of libel *per se*. *Flake v. Greensboro News Co.*, 195 S.E. 55, 60 (N.C. 1938). The Profile's overall tone is neither pejorative nor acrimonious. Indeed, in many cases the policy position described is simply a hair's breadth away from Plaintiff's true position such that falsehood could not possibly be proven.[13] Furthermore,

---

[12] In *Boyce & Isley*, a candidate for Lieutenant Governor sued his opponent, who had defeated him in an election, for libel based upon political advertisements that "directly maligned plaintiffs in their profession by accusing them of unscrupulous and avaricious billing practices." *Boyce & Isley, PLLC*, 153 N.C. App. at 32. The North Carolina Appeals Court has since specifically distinguished this case from circumstances where, as here, a publication merely misstates the policy positions of a candidate. *See Craven v. Cope*, 188 N.C. App. 814 (2008). The court explained that, in the latter situation, "[t]he statements . . . are either matters of personal opinion or rhetorical hyperbole [that] no reasonable reader would believe." *Id.* at 818.

[13] By way of example, Plaintiff claims libel in the students' description of a cartoon on his website, which they wrote "comments on Europe's systems of state run healthcare." (Doc. 19-3 at 1.) The cartoon is, in fact, a comment on the *United Kingdom's* health care system. In the same section, the students wrote that Plaintiff wanted to switch to a single-payer system "similar" to that in Britain, when he actually wants a system "identical" to that of Britain's National Health Service. Such alleged errors, close as they are to Plaintiff's stated policy positions, cannot constitute libel *per se*.

As another example, Plaintiff claims libel in the estate tax section of the Profile wherein the students wrote that Plaintiff was in favor of increasing the estate tax. (Doc. 19-3 at 1.) Plaintiff's true policy proposal is more specific, as he favors a progressively-graduated estate tax, which would involve reducing the estate tax rate for smaller estates, but significantly increasing the rate for larger estates, including "[a] top rate of 77% [that] would apply to that portion of any estate that exceeds $150 million." (Doc. 19-1 at 12.) In a sense, then, the students' profile is accurate—Plaintiff does favor increasing the estate tax, just in a more nuanced way.

Also in the estate tax section, the students wrote that Plaintiff was in favor of using tax revenue increases from his estate tax proposal "to fund social programs that he believes will revitalize the country." (Doc. 19-3 at 1.) Plaintiff claims that he would instead spend increased revenue (from income taxes, not estate taxes) on infrastructure renewal and government contracts. (Doc. 19 at 6-7; Doc. 19-1 at 9.) But these statements are not mutually exclusive where the operative phrase in the Profile ("social programs") is so vacuous as to be seemingly meaningless.

Similarly, in the global warming section of the Profile, the students wrote that, to curb global warming, Plaintiff proposes more research and a solution that includes spraying particles into the atmosphere to reflect the sun's heat. (Doc. 19-3 at 2.) This, essentially, is true. Plaintiff proposes more

many of the challenged statements do not relate to any of Plaintiff's own policy positions at all.[14]  *See Kirch v. Liberty Media Corp.*, 449 F.3d 388, 398 (2d Cir. 2006) (describing common law requirement that defamatory statement must be "of and concerning" the plaintiff).  In short, the Profile does not reflect negatively on Plaintiff such that it

---

research into ways to stop global warming, and has identified particle insertion as a "promising area" for such continued research.  (Doc. 19 at 12.)  Semantics aside, there is no falsehood here.

 The students also wrote, in the education section, that Plaintiff "believes that children need to learn to read and write at [a] young age, but are not afforded the opportunity to do so."  (Doc. 19-3 at 2.)  On his website, Plaintiff bemoans the fact that "at the preschool ages when a child should be greatly increasing his or her vocabulary and learning language skills at home . . . no one is speaking to that child or speaking very little."  (Doc. 19-1 at 19.)  Of course, Plaintiff does not explicitly state that the child needs to "learn to read" at an early age, in recognition of the fact that, as he says in his Complaint, "a child will learn to read when he or she is good and ready to do so."  (Doc. 19 at 13.)  But the problem that the Profile highlights, with which Plaintiff is in agreement, is the lack of adequate early childhood education opportunities for many American households.  This underlying policy position—regardless of any quibbling over when exactly children should learn to read—is the thrust of this section of the Profile and accurately describes Plaintiff's position.

 [14] For example, Plaintiff claims libel for the Profile's description of his view of pro-life advocates, who he claims wish to "punish the pregnant woman."  Plaintiff does not dispute this position, but instead argues that the Profile's stated rationale for this desire to punish—that pro-life individuals want to punish the pregnant woman "due to the fact that they oppose abortion" (Doc. 19-3 at 1)—is inconsistent with his actual view, which is that pro-life supporters want to "punish the pregnant woman for having sex in the first place" (Doc. 19-1 at 14).  In other words, Plaintiff disputes the students' description of his views of the policy positions of others, a far cry from libel *per se*.

 In another claimed error, Plaintiff does not actually dispute the truth of what was written in the Profile (that he proposes income tax increases) but argues that it was libelous for the students not to include his proposed savings from his health care proposals in the description of his income tax increases.  Perhaps Plaintiff would have preferred to have written the Profile himself, but journalistic articles are not campaign press releases.  Such an accurate statement of Plaintiff's positions cannot be libel *per se*.

 In another example, the students wrote that Plaintiff "believes that the best and most efficient health care systems are domestic."  (Doc. 19-3 at 1.)  Plaintiff construes this as offering praise for the American health care system.  This Court, on the other hand, finds the statement somewhat nonsensical.  Whatever system of health care Plaintiff prefers, any nation's system of health care is inherently "domestic."  Perhaps the students meant to write that he prefers systems that are "state-run," which would be an accurate description of his preference for a British National Health Service.  In any event, the Court struggles to see how such a statement could be libelous where it is so meaningless.

 Plaintiff also assigns error in the students' description of the savings from his health care plan, which they wrote could not be "substantiated due to the fact that Haywood leaves out key elements of specifics in his health care pitch."  (Doc. 19-3 at 1.)  This, again, does not actually relate to his policy position itself, but rather the students' efforts to substantiate the claims Plaintiff makes on his website.

 Finally, Plaintiff disputes the Profile's statement that he "accused key Republican members of Congress of taking bribes from this 'Jewish Lobby' in return for favorable treatment."  (Doc. 19-3 at 1.)  Beyond the basis in fact of this statement from Plaintiff's numerous allegations of Israeli bribes and lobbying efforts, *see supra* n.5, the statement does not actually concern Plaintiff's own issue positions.

impugns his character or ability to discharge the duties of President of the United States and is thus not libel *per se*.

### 2.    Libel *Per Quod*

Unlike libel *per se*, the two categories of libel *per quod* require reference to acts or circumstances outside of the alleged libelous statement.  In the first category of libel *per quod*, a publication is not obviously defamatory but when considered with innuendo, colloquium, and explanatory circumstances, the publication becomes libelous.  *See Aycock v. Padgett*, 516 S.E.2d 907, 910 (N.C. Ct. App. 1999).  In the second category, a publication is susceptible of two interpretations one of which is defamatory and the other not.  *Id*.  This type of libel requires a plaintiff to prove that the defendant intended a defamatory meaning and that the recipients or readers understood the statement in a defamatory way.  *Robinson v. Nationwide Ins. Co.*, 159 S.E.2d 896, 899 (N.C. 1968) (citing *Wright v. Commercial Credit Co.*, 192 S.E. 844 (N.C. 1937)).  Also, in a claim of libel *per quod* "special damages must be proven."  *Raymond Univ. v. Duke Univ.*, 371 S.E.2d 701, 708 (N.C. Ct. App. 1988).

Plaintiff's claim for libel *per quod* fails for several reasons.  First, Plaintiff has not identified any contextual elements that would alter a reader's understanding of the Profile.[15]  Absent such context, and having already determined that the Profile is not libel *per se*, this Court cannot now find actionable libel in these circumstances.  Second,

---

[15]  The only context provided in Plaintiff's Amended Complaint is that his friends and family include many Republicans, who would not like the fact that he was running for President as a Democrat. This, of course, relates to an admittedly true portion of the Profile (i.e., he *was* running as a Democrat). Plaintiff has identified no way in which the allegedly libelous statements in the Profile are illuminated or affected by these circumstances.

Plaintiff has failed to show that the student Defendants intended any defamatory meaning arising from the statements contained in the Profile. Plaintiff has provided no factual underpinnings to his conclusory allegation that the student Defendants intended to defame Plaintiff. It would appear that the students had a contrary motive, as they submitted the Profile in fulfillment of an assignment in journalism, a profession that relies on factually accurate reporting. They had nothing to gain, and a grade to lose, by writing falsehoods. *See Kwan-Sa You v. Roe*, 387 S.E.2d 188, 193 (N.C. Ct. App. 1990) ("evidence of ill-will or personal hostility" relevant to assessment of defamatory intent).

Third and finally, Plaintiff has failed to show "special damages." The North Carolina Court of Appeals recently addressed, in a similar defamation action, the issue of a plaintiff's request for damages arising from an election loss, stating:

> This is, in essence, a suit to recover damages for a lost election. We do not consider it the place of this Court to engage in a post-election analysis of the decisions made by the voters . . . in this or any other election. Although this appears to be the first time this question has been raised in this manner in North Carolina, other jurisdictions have similarly concluded that *the notion that the loss of an election constitutes special damages for which a court may grant relief is far too speculative and uncertain to entertain*.

*Aycock*, 516 S.E.2d at 910 (emphasis added). Damages are particularly "speculative and uncertain" in this case, given that Plaintiff lost the election by a significant vote ratio (more than 116 to 1), and the Profile was published to only the audience viewing the website for a St. Michael's College course.

For these reasons, Plaintiff has failed to state a claim for actionable libel under North Carolina law.

**D.      New Hampshire Defamation/Libel Law**

Under New Hampshire law, libel is the "publication of a false statement of fact . . . that tends to lower the plaintiff in the esteem of any substantial and respectable group of people." *Nash v. Keene Pub. Corp.*, 127 N.H. 214, 219 (1985).  This assessment is made by reading the words "in the context of the publication taken as a whole." *Morrissette v. Cowette*, 122 N.H. 731, 733 (1982).  A statement may be libelous even where it lowers the plaintiff in the esteem of only "a small minority." *Thomson v. Cash*, 119 N.H. 371, 373 (1979).  This standard is "to be applied by the court on motion for dismissal or summary judgment, to determine whether the language in question could reasonably have been read to defame the plaintiff." *Duchesnaye v. Munro Enterprises, Inc.*, 125 N.H. 244, 252-53 (1984).  In applying this standard, "[i]t is not enough that the plaintiff, when he reads the words, feels anger or shame." *Thomson*, 119 N.H. at 375.  Instead, the allegedly defamatory statement must "be brought to the attention of a third person [who] understood its defamatory significance." *Id.*

On this score, Plaintiff's libel claim fails.  As stated, the only reputational injury alleged is that Plaintiff's Republican friends and family discovered that he was running as a Democrat when the student Defendants spoke with them to gather background information for their profile.  This injury cannot be actionable libel because it derives only from an admittedly true statement in the Profile and is unrelated to any of the allegedly false descriptions of his policy positions.  Libelous statements must be false; if a true statement causes injury, it is not libel.

Furthermore, Plaintiff has failed to satisfy his burden to prove the students' state of mind with respect to any alleged falsehoods in their profile. New Hampshire applies a standard of negligence in assessing whether a defendant may be liable for defamation: a plaintiff "may recover compensatory damages upon a showing that the defendant was negligent in publishing a defamatory falsehood."[16] *McCusker v. Valley News*, 121 N.H. 258, 260 (1981). In short, Plaintiff has posited no allegations of negligence, and thus cannot recover even compensatory damages as a matter of New Hampshire law.

### E.    The First Amendment

Even if Plaintiff were able to allege sufficient facts to establish his common law libel claim, he cannot meet the heightened standard for defamation that applies to public figures under the First Amendment to the United States Constitution.

"[F]reedom of expression upon public questions is secured by the First Amendment," *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964), and therefore the law should encourage "uninhibited, robust, and wide-open" debate of public issues, *id*. at 270. In particular, "the constitutional guarantee [of free speech] has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Buckley v. Valeo*, 424 U.S. 1, 15 (1976). In recognition of the fact that "erroneous statement is inevitable in free debate" and must be protected "if the freedoms of expression are to have the breathing space that they need to survive," *New York Times*

---

[16] Claims for punitive damages, however, cannot be predicated on mere negligence. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349 (1974). Because Plaintiff seeks $50,000,000 in punitive damages, knowledge of falsity or reckless disregard for the truth must be shown. *Id*. This standard will be addressed in the next section. *See infra*.

*Co.*, 376 U.S. at 271 (quotations omitted), the Supreme Court of the United States has imposed a heightened legal standard on claims of defamation made by both public officials, *id.*, and public figures, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974).

This standard—applicable to Plaintiff in his role as a public figure running for the highest public office, *see Monitor Patriot Co. v. Roy*, 401 U.S. 265, 271 (1971)[17]— requires a plaintiff to prove by "clear and convincing [evidence] that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth." *Gertz*, 418 U.S. at 342. Referred to as the "actual malice" standard, this "heavy burden of proof" must be satisfied for any recovery, including even compensatory damages, to be made by a public figure in a defamation claim. *Herbert v. Lando*, 781 F.2d 298, 308 (2d Cir. 1986). "The question of whether the evidence in a defamation case is sufficient to support a finding of actual malice is a question of law." *Coliniatis v. Dimas*, 965 F. Supp. 511, 517 (S.D.N.Y. 1997) (citing *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 510-11 (1984)).

---

[17] In *Gertz*, the Supreme Court defined "public figure" as "[t]hose who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures." 418 U.S. at 342. The Court went on to give more detail: "That designation [as a public figure] may rest on either of two alternative bases. In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions." *Id.* at 351. To be sure, Plaintiff is not a well-known individual such that he would qualify as a public figure for all purposes. But by seeking the office of President of the United States, a matter of obvious public concern and importance, Plaintiff became a public figure for the purposes of the campaign. Without question, an essential element used to evaluate an individual seeking public office is his or her positions on issues of public policy. Therefore, any articles detailing these policy positions, like that written by the students here, must be assessed against the heightened standard applicable to public figures. In the hearing on the motions, Plaintiff himself did not dispute his status as a public figure, and thus the standard of "actual malice" applicable to his defamation claim.

The Supreme Court has identified several factors as relevant to a finding of actual malice:

> (1) whether a story is fabricated or is based wholly on an unverified, anonymous source, (2) whether the defendant's allegations are so inherently improbable that only a reckless person would have put them in circulation, or (3) whether there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.

*Church of Scientology Intern. v. Behar*, 238 F.3d 168, 174 (2d Cir. 2001) (citing *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968)); *see also Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 183 (2d Cir. 2000) ("Actual malice can be established through the defendant's own actions or statements, the dubious nature of his sources, [and] the inherent improbability of the story [among] other circumstantial evidence.") (internal quotation marks omitted) (alterations in original).

Plaintiff has failed to allege any such evidence, let alone clear and convincing evidence, that the student Defendants acted with malice in publishing the Profile. First, Plaintiff has not alleged facts from which it can be determined that the student Defendants knew anything in the Profile was false. The Court need not, and does not, accept Plaintiff's unsupported assertions to the contrary as true. *See Iqbal*, 556 U.S. at 678; *Dobson v. Harris*, 530 S.E.2d 829, 837 (N.C. 2000) ("conclusory averments rest[ing] . . . not on experienced or otherwise substantiated fact, but on plaintiff's subjective assessment of defendant's motivations" are insufficient to satisfy plaintiff's burden of production as to malice); *see also Shamley v. ITT Corp.*, 869 F.2d 167, 173 (2d Cir. 1989) (failure to allege facts that support a conclusory assertion of malice renders

complaint insufficient on issue of malice).[18]  Accepting Plaintiff's factual (rather than legal) contentions as true, nothing in the record—including the numerous documents appended to the pleadings and supplemental filing by Plaintiff—supports the conclusion that the student Defendants acted with malice in the publication of the Profile.

Plaintiff's sole allegation of malice derives from the student Defendants' contact with Plaintiff's associates in North Carolina.  (Doc. 19 at 3.)  According to Plaintiff, "these contacts were made for one purpose only: pressuring the Plaintiff from continuing his campaign."  (*Id.*)  Plaintiff offers no factual support for this conclusion, and there is no immediately apparent reason why the student Defendants would have such a motivation.  In making this conclusory allegation, Plaintiff seemingly conflates the actual malice standard with malice in the colloquial sense of hostility or ill will.  The latter has nothing to do with the former.  *See Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 666 n.7 (1989) ("The phrase 'actual malice' is unfortunately confusing in that it has nothing to do with bad motive or ill will."); *see also Celle*, 209 F.3d at 183 ("Standing alone . . . evidence of ill will is not sufficient to establish actual malice.").

Plaintiff also overlooks that the reckless disregard standard is subjective, requiring an assessment of the defendant's actual state of mind.  "[R]eckless conduct is not

---

[18]  The Court recognizes the early stage in the proceedings and the ability of plaintiffs to allege malice "and other conditions of a person's mind" with a level of generality in pleadings, given the usual need for a certain amount of discovery to uncover inherently subjective portions of a cause of action. Fed. R. Civ. P. 9(b); *see also Church of Scientology Intern. v. Behar*, 238 F.3d 168, 173 (2d Cir. 2001) ("actual malice inquir[y] typically requires discovery").  As stated by the Second Circuit, "a plaintiff may allege facts suggestive enough to warrant discovery, even where those facts alone would not establish a cause of action for defamation."  *Boyd v. Nationwide Mut. Ins. Co.*, 208 F.3d 406, 410 (2d Cir. 2000). The facts alleged here, however, do not rise to this reduced level of plausibility.  *See Dobson v. Harris*, 530 S.E.2d 829, 837 (N.C. 2000) (where plaintiff "sets forth no specific fact" indicating actual malice, he fails "to negate defendant's presumption of good faith").  Furthermore, Plaintiff does not seek or suggest the need for any discovery on the issue of malice.  In any event, discovery would be fruitless.

measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that *the defendant in fact* entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (emphasis added). Assessed against this proper understanding of actual malice, contacting associates of the subject of a publication such as the Profile is hardly indicative of the journalists' or publishers' reckless disregard of the truth of statements contained in that publication. Indeed, such journalistic investigation "indicates that [D]efendant[s] acted with caution, rather than with reckless disregard of the truth." *FoodScience Corp. v. McGraw-Hill, Inc.*, 592 F. Supp. 362, 366 (D. Vt. 1984). Further, the associates in North Carolina, by Plaintiff's own description, did not even know he was running for president, and thus surely could not have shed any light on the truth or falsehood of the policy positions set out in the Profile.

Next, Plaintiff urges that the inadequacy of the investigation by the student Defendants provides sufficient evidence of actual malice. In making this argument, Plaintiff again ignores the relevant law, as it is well established that the "mere proof of failure to investigate, without more, cannot establish reckless disregard for the truth. Rather, the publisher must act with a high degree of awareness of . . . probable falsity." *Gertz*, 418 U.S. at 332 (internal quotation omitted). As stated by the Vermont Supreme Court: "Malice may not be found merely by showing failure to investigate adequately before publication, failing to verify the facts, or misrepresenting the facts because of a misconception." *Burns v. Times Argus Ass'n, Inc.*, 139 Vt. 381, 777 (1981) (internal

citations omitted).  Applied here, even if the student Defendants should have investigated further before publishing the Profile, and even if a reasonable person would have doubted the veracity of statements contained in the Profile, civil liability does not attach where Plaintiff has failed to proffer any factual allegations indicating that the student Defendants actually "entertained serious doubts as to the truth" of the publication.  *St. Amant*, 390 U.S. at 731.  As shown, Plaintiff's argument that actual malice is shown by a failure to investigate must fail as a matter of law.[19]

Accordingly, Plaintiff's libel and defamation claims fail under both the applicable state law, as well as under the heightened standard required by the First Amendment. Defendants' renewed motions to dismiss (Doc. 23; Doc. 26) are therefore GRANTED.

## II.    Motion to Strike Under Vermont Anti-SLAPP Statute

Defendants also move to strike Plaintiff's Amended Complaint under 12 V.S.A. § 1041, commonly referred to as Vermont's "anti-SLAPP" statute.  (Docs. 12, 26, 27.)

The purpose of anti-SLAPP statutes is to discourage litigants from "filing baseless lawsuits known as Strategic Lawsuits Against Public Participation (SLAPP)."  Bruce E.H. Johnson & Sarah K. Duran, *A View From the First Amendment Trenches: Washington State's New Protections for Public Discourse and Democracy*, 87 WASH. L.

---

[19]  It seemingly goes without saying that, as Plaintiff has failed to show the malice of the student Defendants, he has also failed to show the malice of Defendant St. Michael's College.  "[W]hen the defendant is an organization, a plaintiff must prove that a particular agent or employee of the defendant acted with actual malice at the time that agent or employee participated in the publication of the statement in question; an organizational defendant is not charged with the collective knowledge of all its agents and employees for purposes of the actual malice inquiry."  *Dongguk University v. Yale University*, No. 08-CV-0441, 2012 WL 2087420, at *3 (D. Conn. June 8, 2012).  Plaintiff has not alleged that any agent or employee of St. Michael's College acted with malice, and thus cannot succeed in its defamation claim against this Defendant.

Rev. 495, 496 (2012).  In such lawsuits, "[t]he strategy is to file weak claims with the goal of silencing speakers because they fear the expense and travails of litigation." *Id*. The quintessential SLAPPs are "generally meritless suits brought by large private interests to deter common citizens from exercising their political or legal rights or to punish them for doing so." *Duracraft Corp. v. Holmes Products Corp.*, 691 N.E.2d 935, 940 (Mass. 1998) (quoting *Wilcox v. Superior Court*, 27 Cal. App. 4th 809, 816-17 (Cal. App. 2d 1994)).  By freeing individuals of the fear of such reprisals and allowing speedy dismissal of meritless lawsuits, anti-SLAPP statutes are meant to protect a defendant's right to freedom of speech and to petition, and thereby guarantee robust public debate and discussion.  Citing a "disturbing increase" in such lawsuits, the Vermont Legislature recognized that "[i]t is in the public interest to encourage continued participation in matters of public significance, and this participation should not be chilled through abuse of the judicial process."  2006 Vt. Laws Public Acts 134.

Enacted in 2006, the Vermont anti-SLAPP statute reads, in pertinent part:

A defendant in an action arising from the defendant's exercise, in connection with a public issue, of the right to freedom of speech or to petition the government for redress of grievances under the United States or Vermont Constitution may file a special motion to strike under this section.

12 V.S.A. § 1041(a).  Subsection (i) sets forth four types of conduct or communication that are protected, including: "any written or oral statement concerning an issue of public interest made in a public forum or a place open to the public; [and] any other statement or conduct concerning a public issue or an issue of public interest which furthers the

exercise of the constitutional right of freedom of speech or the constitutional right to petition the government for redress of grievances." 12 V.S.A. § 1041(i).

Analysis under the anti-SLAPP statute proceeds through a two-step burden-shifting process. First, the party bringing the motion to strike must make a threshold showing that the case arises from his or her exercise of the freedom of speech or freedom to petition the government. A defendant meets this burden by demonstrating that the act underlying the plaintiff's cause of action fits one of the categories spelled out in subsection (i) of the anti-SLAPP statute. If the court concludes that this showing has been made, the burden shifts to the plaintiff. At this stage, the court must grant the special motion to strike unless the plaintiff shows that "the defendant's exercise of his or her right to freedom of speech and to petition was devoid of any reasonable factual support and any arguable basis in law[,] and . . . the defendant's acts caused actual injury to the plaintiff." 12 V.S.A. § 1041(e)(1).[20] This determination is made on the basis of "the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based." 12 V.S.A. § 1041(e)(2). If the plaintiff fails to meet this burden, and the court thus grants the special motion to strike, "the court shall award costs and reasonable attorney's fees to the defendant." 12 V.S.A. § 1041(f)(1). This award of

---

[20] The statute, on its face, provides little guidance on the applicable standard of proof at each level of the analysis. As to an identically-worded section of its state statute, the Massachusetts Supreme Judicial Court concluded "that the party opposing a special motion to dismiss is required to show by a preponderance of the evidence that the moving party lacked any reasonable factual support or any arguable basis in law" for its protected activity. *Baker v. Parsons*, 750 N.E.2d 953, 961 (Mass. 2001). This Court need not definitively choose a standard, however, because, under any arguable standard of proof, *see Baker*, 750 N.E.2d at 961 n.19 (collecting cases), the special motion to strike must be allowed.

costs and fees provides an added deterrent to the filing of SLAPPs, and frees defendants of the usual burden of costly defense of such lawsuits.

Although certain federal courts have declined to apply state anti-SLAPP provisions on the basis that such provisions conflict with the Federal Rules of Civil Procedure, *see, e.g.*, *Stuborn Ltd. Partnership v. Bernstein*, 245 F. Supp. 2d 312, 316 (D. Mass. 2003), this Court has previously held that an anti-SLAPP motion to strike may be brought in federal court, *see Bible & Gospel Trust v. Twinam*, 2:07-CV-17, 2008 WL 5216845, at *2 (D. Vt. July 18, 2008) (Niedermeier, Mag. J.), *adopted in relevant part*, 2008 WL 5245644 (D. Vt. Dec. 12, 2008).  Applying the two-part test of *Hanna v. Plumer*, 380 U.S. 460 (1965), the Court held that: "[b]ecause there is no direct conflict between the Vermont anti-SLAPP statute and the Federal Rules, and because the state interest outweighs any federal interest, the Vermont anti-SLAPP statute should apply in federal courts." *Id*.  Applying the statute here, this Court must decide two questions: (1) whether the anti-SLAPP statute applies to the students' conduct; and (2) if so, whether Plaintiff has made the showing required to defeat the special motion to strike.

Like any case that calls for the application of Vermont law, it is the role of this Court to apply the Vermont anti-SLAPP statute as the Vermont Supreme Court would apply it.  *See Morse v. University of Vermont*, 776 F. Supp. 844, 850 (D. Vt. 1991). Since the enactment of Vermont's anti-SLAPP statute in 2006, however, the Vermont Supreme Court has not had occasion to interpret that statute.  Given this dearth of controlling precedent, any analysis must begin with the text of the statute, as well as persuasive authority from other jurisdictions interpreting analogous statutes and any other

"sources on which the state's highest court might rely."  *F.D.I.C. v. National Union Fire Ins. Co. of Pittsburgh, PA*, 205 F.3d 66, 71 (2d Cir. 2000).[21]

As to the threshold question of whether the students' actions fall within the scope of the anti-SLAPP statute, it is clear that the writing of the Profile was an exercise of the students' freedom of speech.  Although Plaintiff's cause of action alleges defamation, such claims are among the "[t]he favored causes of action in SLAPP suits."  *Wilbanks v. Wolk*, 121 Cal. App. 4th 883, 890 (Cal. App. 1d 2004).  Accordingly, the anti-SLAPP statute protects such conduct.  *See Hecimovich v. Encinal School Parent Teacher Organization*, 203 Cal. App. 4th 450, 464 (Cal. App. 1d 2012).  Rather than look solely to the nature of Plaintiff's cause of action, the students' underlying activity should be examined.

The student Defendants' conduct falls squarely under the activities enumerated in subsection (i) of Vermont's statute—"any written or oral statement concerning an issue of public interest made in a public forum or a place open to the public."  12 V.S.A. § 1041(i)(3).  Interpreting its analogous provision, California courts have identified three categories of conduct that involve "statement[s] made in connection with a public issue":

"(1) the subject of the statement or activity precipitating the claim was a person or entity in the public eye; (2) the statement or activity precipitating the claim

    [21] In this regard, the Court relies in large part on the decisions of California's appellate courts, given that California's anti-SLAPP statute is substantially similar to Vermont's.  *Compare* California Code of Civil Procedure § 425.16, *with* 12 V.S.A. § 1041.  Most importantly, California's anti-SLAPP statute is similar in breadth to Vermont's, specifically protecting both the right to petition the government and the right of free speech.  Anti-SLAPP statutes in other states are in some cases more restrictive, however, and protect only the exercise of the right to petition the government.  *See, e.g.*, Mass. Gen. Laws c. 231, § 59H; *see also Fustolo v. Hollander*, 920 N.E.2d 837, 844 n.12 (Mass. 2010) (citing this distinction between the California and Massachusetts statutes as the rationale for its decision not to follow California precedent).

involved conduct that could affect large numbers of people beyond the direct participants; and (3) whether the statement or activity precipitating the claim involved a topic of widespread public interest."

*Wilbanks*, 121 Cal. App. 4th at 898.[22]  The conduct at issue here meets all three definitions: (1) Plaintiff, as a candidate for President, was in the public eye; (2) Plaintiff had the potential to affect large numbers of people with his candidacy; and (3) the election (as well as each issue area addressed in the Profile) was a topic of widespread public interest.  *See Stryker v. Republic Pictures Corp.*, 108 Cal. App. 2d 191, 194 (Cal. App. 2d 1951) ("A politician running for public office, in effect offers his public and private life for perusal so far as it affects his bid for office."); *see also Beilenson v. Superior Court*, 44 Cal. App. 4th 944, 949-50 (Cal. App. 2d 1996); *Macias v. Hartwell*, 55 Cal. App. 4th 669, 672 (Cal. App. 2d 1997).  Furthermore, California courts have specifically applied the anti-SLAPP statute to publications similar to the Profile, including works of journalism.  *See Lafayette Morehouse, Inc. v. Chronicle Publishing Co.*, 37 Cal. App. 4th 855, 862-63 (Cal. App. 1d 1995).  The Profile, therefore, was in furtherance of the students' right to free speech under the United States and Vermont Constitutions and concerned a public issue.

Publication of the Profile also took place in a public forum.  The term "public forum" as used in the anti-SLAPP statute, has been "traditionally defined as a place that is open to the public where information is freely exchanged."  *Damon v. Ocean Hills*

---

[22]  As stated, *see supra* n.21, the Court relies upon precedent from the California appellate courts. This is particularly appropriate in addressing what constitutes protected activity, as the relevant provision of the Vermont anti-SLAPP statute is a nearly-verbatim recitation of its California counterpart.  *Compare* 12 V.S.A. § 1041(i), *with* California Code of Civil Procedure § 425.16(e).

*Journalism Club*, 85 Cal. App. 4th 468, 475 (Cal. App. 4d 2000). The California courts have held that "[a]n Internet website that is accessible to the general public," such as the website at issue here, "is a public forum." *Cole v. Patricia A. Meyer & Associates, APC*, 206 Cal. App. 4th 1095, 1121 (Cal. App. 2d 2012); *see Barrett v. Rosenthal*, 40 Cal. 4th 33, 41 n.4 (Cal. 2006). Plaintiff has not alleged that access to the website on which the Profile was published was restricted or limited, nor could he, as that assertion would undermine his claim that the publication cost him the New Hampshire election and injured his reputation in North Carolina.[23]

The Court thus concludes that the Profile was published in a public forum, and the publication was in furtherance of the student Defendants' right to free speech and involved speech concerning a public issue. Therefore, Defendants have met their threshold burden of proving that their conduct is protected by the anti-SLAPP statute.[24]

___

[23] Although the Court concludes that the Profile was published in a public forum, this conclusion is not necessary to rule in Defendants' favor. The anti-SLAPP statute, by its terms, extends not only to "any written or oral statement concerning an issue of public interest made in a public forum or a place open to the public," but also to "any other statement or conduct concerning a public issue or an issue of public interest which furthers the exercise of the constitutional right of freedom of speech." *See* 12 V.S.A. § 1041(i).

[24] As publisher of the Profile, Defendant St. Michael's College is also entitled to protection under the anti-SLAPP statute. Publication itself is distinct expressive conduct worthy of anti-SLAPP protection. The California Supreme Court has rejected the view that its anti-SLAPP statute "protects only statements or writings that defend the speaker's or writer's *own* free speech or petition rights." *Briggs v. Eden Council for Hope & Opportunity*, 19 Cal. 4th 1106, 1116 (Cal. 1999) (emphasis added). "[T]he statute does not require that a defendant moving to strike . . . demonstrate that its protected statements or writings were made *on its own behalf.*" *Id.*; s*ee Warner v. Lompoc Unified School Dist.*, 2d Civil No. B154976, 2002 WL 31863437 (Cal. App. 2d Dec. 23, 2002); *Taus v. Loftus*, 40 Cal. 4th 683, 713 (Cal. 2007) (identifying "writing and publishing" as "conduct in furtherance of [the] right of free speech"); *Nygard, Inc. v. Uusi-Kerttula*, 159 Cal. App. 4th 1027 (Cal. App. 2d 2008) (granting special motion to strike filed by magazine publisher). The purpose of the anti-SLAPP statute (the protection and encouragement of free expression) is also furthered by allowing those who provide a forum for speech, such as publishers, to avail themselves of anti-SLAPP protection. Frivolous litigation against a provider of a forum for speech does just as much to chill expression as suit against the speaker directly—a speaker needs a forum in which to speak.

The burden now shifts to Plaintiff to show that (1) Defendants' "exercise of [their] right to freedom of speech . . . was devoid of any reasonable factual support and any arguable basis in law"; *and* (2) Defendants' acts "caused actual injury" to him. 12 V.S.A. § 1041(e)(1). At the very least, to meet the first prong of this test, Plaintiff "must demonstrate that his claim is legally sufficient." *Hecimovich*, 203 Cal. App. 4th at 469; *see Wenger v. Aceto*, 883 N.E.2d 262, 267 (Mass. 2008) ("critical determination" is "whether [the speech activity] contains any reasonable factual or legal merit at all").

In light of the resolution of Defendants' motions to dismiss, Plaintiff has failed to meet this showing. The statements in the Profile have much more than an "arguable" basis in law; they have a decidedly firm basis in law—Plaintiff cannot satisfy the elements of libel under either North Carolina or New Hampshire law and cannot show that Defendants acted with "actual malice" as the First Amendment requires. *See Cabrera v. Alam*, 197 Cal. App. 4th 1077, 1093 (Cal. App. 4d 2011) (dismissing claim under second prong of anti-SLAPP motion analysis because "[p]laintiff did not produce any evidence showing that defendant acted with malice"); *Christian Research Institute v. Alnor*, 148 Cal. App. 4th 71, 84-93 (Cal. App. 4d 2007) (same); *see also Ampex Corp. v. Cargle*, 128 Cal. App. 4th 1569, 1578-79 (Cal. App. 1d 2005) ("In the context of an anti-SLAPP suit, courts must consider the pertinent burden of proof in ascertaining whether the plaintiff has shown a probability of prevailing. . . . Thus, limited purpose public figures such as respondents who sue for defamation must establish a probability that they can produce clear and convincing evidence that the allegedly defamatory statements were made with knowledge of their falsity or with reckless disregard of their truth or falsity.").

Plaintiff has failed to meet his burden to show that the student Defendants' profile lacked an arguable basis in law.

The statements in the Profile also have reasonable factual support when compared against statements on Plaintiff's own website. *See supra* n.13. Moreover, the "actual injury" allegedly suffered by Plaintiff is highly speculative, considering that he lost the primary by an overwhelming margin; the Profile was published only on the St. Michael's College website; and Plaintiff's alleged reputational injury derived primarily from a true statement contained in the Profile (his party affiliation). *See Schelling v. Lindell*, 942 A.2d 1226, 1231-32 (Me. 2008) ("the party opposing the special motion to dismiss must show a reasonably certain monetary valuation of the injury she has suffered. . . . claimed loss of sleep, mental suffering, and embarrassment are not legally sufficient to meet the actual injury requirement"). Plaintiff cannot meet his burden.

Accordingly, Defendants' renewed motion to strike must be GRANTED.[25] Given this resolution, the Vermont anti-SLAPP statute entitles Defendants to reasonable

---

[25] This Court has previously treated motions to strike under the anti-SLAPP statute as analogous to motions for summary judgment. *See Bible & Gospel Trust v. Twinam*, No. 1:07-CV-17, 2008 WL 5245644, at *1 (D. Vt. Dec. 12, 2008). As such, the filing of the special motions to strike operated, effectively, as the filing of a motion for summary judgment for the purposes of the application of the Federal Rules of Civil Procedure. Despite this, there is no indication in the record that the required notice was sent to Plaintiff, as a *pro se* litigant, regarding the nature of a summary judgment motion and the consequences of a failure to respond. *See Vital v. Interfaith Medical Center*, 168 F.3d 615, 620-21 (2d Cir. 1999). The Court, however, finds this omission excusable, largely on the basis that the special motion to strike (i.e., the summary judgment motion) raises no contested issues of fact to which Plaintiff might object or seek further discovery. To the extent the motion disputes factual allegations in the Complaint, the Complaint's version of events controls. Also, the failure to provide Plaintiff with the requisite notice is of little consequence where Plaintiff has a measure of legal knowledge as a trained lawyer, filed a direct response to the motion (Doc. 29), supplied an affidavit with evidence outside of the record (Doc. 31), and filed a supplemental response after full participation in a hearing on the motion (Doc. 33).

attorney's fees and costs. *See* 12 V.S.A. § 1041(f)(1) ("If the court grants the special motion to strike, the court *shall* award costs and reasonable attorney's fees to the defendant." (emphasis added)); *see also Toyrrific, LLC v. Karapetian*, No. 2:12-CV-04499, 2012 WL 5306229, at *6 (C.D. Cal. Oct. 26, 2012) (awarding attorney's fees and costs under California anti-SLAPP statute).

For the sake of clarity, it bears mention that Defendants are entitled to the entirety of their reasonable attorney's fees and costs. Although the relevant language of the statute may be construed as ambiguous, it is nearly identical to that appearing in the California statute. *Compare* 12 V.S.A. § 1041(f)(1) ("If the court grants the special motion to strike, the court shall award costs and reasonable attorney's fees to the defendant."), *with* California Code of Civil Procedure § 425.16(c) ("a prevailing defendant on a special motion to strike shall be entitled to recover his or her attorney's fees and costs"). Initially, under the California law "a prevailing defendant on a motion to strike [was] allowed to recover attorney fees and costs only on the motion to strike, not the entire suit." *Lafayette Morehouse, Inc. v. Chronicle Publishing Co.*, 39 Cal. App. 4th 1379, 1383 (Cal. App. 1d 1995). Since that 1995 decision, however, some courts have questioned whether the holding limiting attorney's fees was superseded by statute, as that case was decided "before the California Legislature amended the anti-SLAPP statute to mandate that the statute be 'construed broadly.'" *Manufactured Home Communities, Inc.*

---

The anti-SLAPP statute itself also empowers this Court to order that limited discovery take place "for the purpose of assisting its decision on the special motion to strike." 12 V.S.A. § 1041(c)(2). Regardless, no additional materials, discovery or otherwise, are necessary for resolution of the pending motion, and neither party has asked for discovery. Indeed, a prompt disposition, without additional delay, will better serve the purpose of the anti-SLAPP statute, as this claim does not merit subjecting Defendants to the costs of discovery.

*v. County of San Diego*, 655 F.3d 1171, 1181 n.1 (9th Cir. 2011); *see also Kearney v. Foley & Lardner*, No. 05-CV-2112, 2008 WL 761089, at *3 (S.D. Cal. Mar. 18, 2008) ("All expenses incurred on common issues of fact and law qualify for an award of attorneys' fees under the anti-SLAPP statute[.]"); *Metabolife Intern., Inc. v. Wornick*, 213 F. Supp. 2d 1220, 1223-24 (S.D. Cal. 2002). Admittedly, no such intervening amendment to the Vermont statute has taken place calling for its broad construction.[26]

Vermont law governing other fee-shifting provisions, however, clarifies that the Vermont Supreme Court would, in these circumstances, award Defendants attorney's fees and costs for the entire case. *See Elec. Man, Inc. v. Charos*, 2006 VT 16, ¶ 9, 179 Vt. 351, 895 A.2d 193 (attorney's fee award should not be apportioned based on recovery on each claim when claims at issue share common core of facts); *L'Esperance v. Benware*, 2003 VT 43, ¶¶ 21-26, 175 Vt. 292, 830 A.2d 675 (affirming attorney's fee award for consumer-fraud claim, including time spent on alternative claims, when alternative claims arose out of the same transaction). The entirety of the litigation involved a common set of facts giving rise to one legal claim (defamation) and, in response to this claim, two motions (the motion to dismiss and special motion to strike). The legal work on the two motions is inextricably linked, as the special motion to strike rests on Defendants' efforts to refute Plaintiff's attempts to show that their expression had no "arguable basis in law," while the motion to dismiss involves the very same application of the law of defamation. Such motions cannot "be viewed as a series of discrete [issues]

---

[26] On the other hand, Vermont has also never placed a limitation on the scope of its anti-SLAPP statute. *But see* California Code of Civil Procedure § 425.17 (exempting certain defendants, mainly corporate and other business interests, from being able to file motions to strike under anti-SLAPP statute).

so that the hours expended can be divided on a [motion-by-motion] basis." *L'Esperance*, 2003 VT 43, ¶ 17. Because of the substantive convergence of the legal arguments in the special motion to strike and the motion to dismiss, as well as the identical factual scenario underlying the motions, severance of the work for the two motions is untenable. As such, Defendants must be compensated "for all hours reasonably spent, including those relating solely to [obtaining] the fee [award]." *Serrano v. Unruh*, 652 P.2d 985, 986 (Cal. 1982). In addition to such practical considerations, this conclusion also promotes the policy of the anti-SLAPP statute, as it guarantees that costly litigation will not chill protected expression.

## Conclusion

For these reasons, Defendants' original motions to dismiss (Docs. 15, 16) and anti-SLAPP special motions to strike (Docs. 7, 12) are DENIED AS MOOT; and Defendants' renewed motions to dismiss (Docs. 23, 26) and anti-SLAPP special motions to strike (Docs. 26, 27) are GRANTED.

Furthermore, pursuant to 12 V.S.A. § 1041(f)(1), Plaintiff is ORDERED to pay all costs and reasonable attorney's fees incurred by Defendants in this litigation. The parties shall endeavor to stipulate to the amount of fees and costs, but if they are unable to do so within 30 days of this Order, defense counsel may submit a motion for approval of requested fees together with supporting documentation. Any claim for attorney's fees must include contemporaneous records of an attorney's actual time expended on the motions and usual billing rates, as well as a breakdown of expenses. *See, e.g.*, 28 U.S.C. § 2412(d)(1)(B). In addition, because the Court will apply a reasonable hourly rate for

partners and associates in this district, documentation to establish that rate, by attorney affidavit and/or citation to prior cases in this district, should also be submitted. *See Luessenhop v. Clinton County, N.Y.*, 558 F. Supp. 2d 247, 258 (N.D.N.Y. 2008); *see also Spooner v. Town of Topsham*, 2010 VT 71, ¶ 6, 188 Vt. 293, 9 A.3d 672 ("the court must determine the reasonable fee under the circumstances of the case . . . by multiplying the number of hours reasonably expended on the case by a reasonable hourly rate . . . [and] [t]hat fee may then be adjusted upward or downward based on various factors"). Plaintiff may file a memorandum of opposition to the motion consistent with Local Rule 7(a)(3). The Court will thereafter schedule a hearing to determine the amounts to be awarded, if required.

Dated at Burlington, in the District of Vermont, this 14th day of December, 2012.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge